**FILED**

April 23, 2025

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
By:_____ DT_____
Deputy

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

UNITED STATES OF AMERICA,

      **Plaintiff,**

v.

**CAPSULCN INTERNATIONAL CO., LTD.,**
d/b/a "CapsulCN," "PillMolds," "Zhejiang Wisely Machinery Co. Ltd.," "iPharmachine Corp.," "Huada Pharmaceutical," "Ruian Shanfan Enterprise Management Co. Ltd.," "Ruian Runfeng Enterprise Management Partnership," "Ruian Danfeng Enterprise Management Partnership," "Zhejiang CapsulCN Machinery Co., Ltd.," "Zhejiang CapsulCN Imp. & Exp Co., Ltd.," and "HUADACN Pharmaceutical Machinery Co., Ltd."

**XIAOCHUAN PAN,**
a/k/a "潘肖川" and "Ricky Pan"

**TINGYAN YANG,**
a/k/a "杨挺燕," "Monica Yang," and "Cici"

**XI CHEN,**
a/k/a "晨曦" and "Inna"

      **Defendants.**

**Case No: EP:25-CR-00957-LS**

**S E A L E D**
**INDICTMENT**

**COUNT 1:** 18 U.S.C. §§ 371, 545, Conspiracy to Smuggle;
**COUNTS 2–6:** 18 U.S.C. § 545, Smuggling;
**COUNT 7:** 21 U.S.C. §§ 846, 843(a)(5), 843(a)(7), 843(b), Conspiracy to Violate the Controlled Substances Act;
**COUNT 8:** 21 U.S.C. § 848, Continuing Criminal Enterprise;
**COUNTS 9–12:** 21 U.S.C. § 843(a)(5), Distribution of Counterfeit Die Molds;
**COUNTS: 13–14:** 21 U.S.C. § 843(a)(7), Importation and Distribution of Tableting Machines and Other Equipment;
**COUNTS 15–18:** 21 U.S.C. § 843(b), Use of a Communication Facility to Violate the Controlled Substances Act;
**COUNT 19:** 18 U.S.C. § 1956(a)(2)(A), 1956(h), Conspiracy to Commit International Promotional Money Laundering; and
**COUNTS 20–21:** 18 U.S.C. § 1956(a)(2)(A), International Promotional Money Laundering.

***Notice of Government's Demand for Forfeiture***

THE GRAND JURY CHARGES:

At all approximate times relevant to this Indictment, unless otherwise indicated:

**INTRODUCTION**

1.     Just two milligrams of fentanyl can constitute a lethal dose. In 2024, the United States Drug Enforcement Administration ("DEA") seized more than 60 million fentanyl-laced fake

pills and nearly 8,000 pounds of fentanyl powder, the equivalent of more than 377 million potentially lethal doses. Many of the fake pills seized in the United States were manufactured using relatively inexpensive pill-making equipment, such as tableting presses and die molds, obtained from pharmaceutical equipment companies in the People's Republic of China and imported into the United States.

2.      For more than thirteen years, Defendant CAPSULCN INTERNATIONAL CO., LTD. ("CAPSULCN") marketed, sold, imported, and distributed such pill-making equipment and materials to customers in the United States who then used that equipment to manufacture pills and capsules containing controlled substances, including fake pills bearing the markings of legitimate prescription drugs.

3.      CAPSULCN, its related entities, officers, and employees, knew and had reason to believe that the pill-making equipment it sold to United States customers and shipped to locations across the United States would be used by drug traffickers to manufacture fake pills and capsules that were often contaminated with deadly controlled substances such as fentanyl and methamphetamine. CAPSULCN used multiple websites, various popular social media sites, and e-commerce platforms to advertise and sell pill presses, encapsulating machines, die molds, and other pill-making equipment to customers in the United States. CAPSULCN then conspired with its customers to conceal the true nature and purpose of the pill-making equipment from United States customs and law enforcement to smuggle their merchandize into the United States. In doing so, CAPSULCN received millions of dollars in payments from customers in the United States.

I.    **The Role of Pharmaceutical Equipment Distributers in the Illicit Drug Trade**

4.    Drug traffickers include manufacturers, importers, and distributers of illicit controlled substances in the United States, the People's Republic of China, and elsewhere.

5.    Drug traffickers commonly use corporate entities, business partnerships, and formal organizational structures to source and supply chemicals, controlled substances, and pharmaceutical equipment necessary for the manufacture and distribution of controlled substances. These formal structures allow the drug traffickers to source and supply these products at a greater scale and efficiency and provide a façade of legitimacy that helps conceal the drug traffickers' illegal activities.

6.    Drug traffickers often manufacture and distribute counterfeit prescription pain, attention-deficit, and anti-anxiety drugs such as oxycodone, hydrocodone, amphetamine, dextroamphetamine, and alprazolam. When manufacturing such illicit counterfeit prescription drugs, drug traffickers match the colors of and imprints on the tablets to those of the prescription drugs so that they appear to be legitimate, branded prescription drugs. However, drug traffickers commonly replace the active pharmaceutical ingredients of the legitimate prescription drugs with much cheaper and stronger synthetic opioids, such as fentanyl and fentanyl analogues, or stimulants, such as methamphetamine. These counterfeit prescription drugs are in high demand with United States consumers due to their perceived safety and familiarity and have proven profitable to drug traffickers due to their relatively cheap cost of production and distribution compared to traditional illicit controlled substances, such as heroin and cocaine. Drug traffickers also manufacture and distribute pills containing controlled substances that do not look like legitimate prescription drugs, instead imprinting such pills with various symbols, marks, or the trademarks of consumer goods.

3

7.     When manufacturing pills that contain controlled substances, drug traffickers rely on the supply of cheaply produced pharmaceutical equipment by equipment manufacturers based in the People's Republic of China. These equipment manufacturers knowingly manufacture, import, and distribute the equipment at low costs to drug traffickers in the United States and elsewhere. This pharmaceutical equipment commonly includes tableting machines, encapsulating machines, and die molds.

8.     Tableting machines, also commonly referred to as "tablet presses" or "pill presses," create tablets by pressing together one or more excipients (i.e., binding agents and colored dyes) and active pharmaceutical ingredients. Tableting machines range in capacity from hand-held manual tablet presses, making one tablet at a time, to refrigerator-sized automatic rotary tableting machines ("RTPs"), which can produce hundreds of thousands of tablets an hour and can cost tens of thousands of dollars. The tablet desktop press—commonly referred to as a "TDP"—falls between these extremes in terms of size, output, and price. TDPs fit on a standard table or desktop, can produce a few thousand tablets per hour, and can cost up to several thousand dollars. TDPs offer a range of options, including products that require a manual crank and those that operate automatically.

9.     Tablet press die molds, also commonly referred to as "dies," usually take the form of small metal cylinders installed in tableting machines to compress a combination of various ingredients, including powdered excipient or "binder" and active pharmaceutical ingredients, into tablets. Die molds can press tablets into a variety of shapes and typically bear an embossed design or mark that becomes imprinted into the sides of the pressed tablet. Counterfeit die molds bear the identifying marks, shapes and designs of legitimate pharmaceutical drugs, prescription drugs, and consumer goods that have been trademarked in the United States and are unauthorized by the

trademark holders. For example, a legitimate brand-named 30mg oxycodone tablet bears the imprint "M" on one side and the imprint "30" on the other, giving the tablet its common name, "M30." Drug traffickers use die molds to copy these imprints on tablets that contain illicit controlled substances but otherwise appear to be legitimate, branded M30 tablets.

10.    Encapsulating machines, also commonly referred to as "encapsulators" or "capsule fillers," fill gelatin capsules with excipient and active ingredients. Encapsulating machines range in capacity from small manual encapsulators, which can fill a few hundred capsules an hour, to refrigerator-sized automatic encapsulators, which can fill hundreds of thousands of capsules an hour. Like the costs of tableting machines, the costs of encapsulators are dependent on their size, complexity, and output. Large automatic encapsulators can cost tens of thousands of dollars.

11.    The Drug Enforcement Administration (DEA) regulates tableting machines and encapsulating machines due to their potential for misuse (i.e., the manufacture of illicit controlled substances). The DEA requires importers and distributers of tableting machines and encapsulating machines to record certain transfers of the machines on a standardized form, referred to as "DEA Form 452," and file the form with the DEA. Importers and distributers of tableting and encapsulating machines must file the DEA Form 452 with the DEA before they import any such machine into the United States and before they transfer any such machine to another person within the United States. An important purpose of the DEA's registration system is to prevent the transfer of the machines to drug traffickers who would use the machines to manufacture illicit controlled substances.

12.    Drug traffickers commonly acquire tableting machines, encapsulating machines, and counterfeit die molds by concealing the nature of the transactions from United States law enforcement. To avoid detection by United States law enforcement, including the United States

Customs and Border Protection and United States Homeland Security Investigations (collectively, "U.S. Customs authorities"), and the DEA, drug traffickers commonly attempt to purchase and obtain the machines by concealing their identities, including using third parties or "straw purchasers" to purchase the machines and by using false addresses to receive the machines. Drug traffickers also commonly avoid detection by attempting to purchase the machines from importers and distributers who agree not to comply with the DEA Form 452 registration system and who agree to falsely label and manifest the machines to avoid detection by U.S. Customs authorities.

## II.    The Defendants and Co-Conspirators

13.    The defendant, CAPSULCN INTERNATIONAL CO., LTD. ("CAPSULCN"), was a company established in or around 2008, and was located in Ruian City, Zhejiang Province, People's Republic of China. The defendant CAPSULCN operated as a common enterprise with the following business entities: Zhejiang Wisely Machinery Co. Ltd., iPharmachine Corp., Huada Pharmaceutical, Ruian Shanfan Enterprise Management Co. Ltd., Ruian Runfeng Enterprise Management Partnership, Ruian Danfeng Enterprise Management Partnership, Zhejiang CapsulCN Machinery Co., Ltd., Zhejiang CapsulCN Imp. & Exp Co., Ltd., and HUADACN Pharmaceutical Machinery Co., Ltd., and operated under variations of these business entity names and the affiliated brand names "CapsulCN" and "PillMolds." CAPSULCN imported into the United States, including into the Western District of Texas, and distributed tableting machines, encapsulating machines, die molds, and other pharmaceutical equipment.

14.    The defendant, XIAOCHUAN PAN ("PAN"), also known as "潘肖川" and "Ricky Pan," is a citizen and resident of the People's Republic of China. Defendant PAN was a shareholder, principal, and general manager of CAPSULCN.

15.     The defendant, TINGYAN YANG ("YANG"), also known as "杨挺燕," "Monica Yang, and "Cici," was a citizen and resident of the People's Republic of China. Defendant YANG was employed by defendant CAPSULCN, earned commission on her sales of CAPSULCN products, and had an ownership interest in CAPSULCN.  YANG began her employment with CAPSULCN in and about September 2014.

16.     The defendant, XI CHEN ("CHEN"), also known as "晨曦" and "Inna," was a citizen and resident of the People's Republic of China. Defendant CHEN was employed by defendant CAPSULCN as a salesperson of CAPSULCN products.

17.     Co-Conspirator-1, whose identity is known to the Grand Jury, was a shareholder of Defendant CAPSULCN and was the registrant of Defendant CAPSULCN's iPharmachine Corp. business.

18.     Co-Conspirator-2, Co-Conspirator-3, Co-Conspirator-4, and Co-Conspirator-5, whose identities are known to the Grand Jury, were employed by Defendant CAPSULCN and were salespeople who sold pharmaceutical equipment to customers in the United States, including tableting machines and counterfeit die molds.  Co-Conspirator-2 left the employment of Defendant CAPSULCN in and around February 2015, and Co-Conspirator-3 left the employment of Defendant CAPSULCN in and around 2017.

19.     Co-Conspirator-6, whose identity is known to the Grand Jury, was a United States-based customer of Defendant CAPSULCN who allowed Co-Conspirator-1 and Defendant CAPSULCN to use his/her warehouse in California, as a business location of iPharmachine Corp. As payment by Defendant CAPSULCN, Co-Conspirator-6 received shipments of pharmaceutical equipment from Defendant CAPSULCN to store in Co-Conspirator-6's California-based warehouse before shipping the equipment to United-States-based customers.

III.    **The CAPSULCN Scheme**

20.    From on or about December 2, 2011, continuing to the date of this Indictment, the exact dates unknown, in the Western District of Texas, Southern District of Texas, Eastern District of Michigan, Central District of California, Northern District of California, District of Connecticut, Southern District of Florida, Northern District of Georgia, the People's Republic of China, and elsewhere, Defendants CAPSULCN, PAN, YANG, and CHEN, along with others known and unknown to the Grand Jury, engaged in a scheme to smuggle pharmaceutical equipment, including tableting machines, encapsulating machines, and die molds, from the People's Republic of China into the United States and to distribute the smuggled goods to individuals in the United States knowing, intending, and having reasonable cause to believe, that the pharmaceutical equipment was to be used to manufacture controlled substances, including counterfeit prescription drugs containing fentanyl and methamphetamine. It was also part of CAPSULCN's scheme, to promote the scheme by laundering funds from the United States to, from, and through a place outside of the United States, including the People's Republic of China.

21.    Defendant PAN supervised and directed CAPSULCN's operations, including its sales of tableting machines, encapsulating machines, and die molds, including counterfeit die molds, to customers in the United States. Defendant PAN interviewed and hired some employees of CAPSULCN, determined which work functions those employees could perform, and awarded financial compensation based on the success of co-conspirators' illicit sales of pharmaceutical equipment. Defendant PAN had access to the CAPSULCN financial accounts and, as a shareholder, ultimately received proceeds from the CAPSULCN operation.

<u>MANNER AND MEANS OF THE SCHEME</u>

It was part of the scheme that:

22.    To reach customers in the United States, CAPSULCN registered and operated a network of websites in English, including but not limited to, "www.capsulcn.com," "www.ipharmachine.com," "www.huadapharma.com," and "www.pillmold.com," and online storefronts on e-commerce platforms, including the storefronts "capsulcn" and "capsulcn-sale" on E-Commerce Platform-1, the identity of which is known to the Grand Jury. Through these websites and online storefronts, CAPSULCN advertised and sold pharmaceutical equipment, including tableting machines, encapsulating machines, and counterfeit die molds to customers, including drug traffickers, in the United States.

23.    CAPSULCN also owned and operated a network of social media accounts in English that marketed to customers in the United States, including drug-trafficking clientele, who purchased machines and die molds. This network of social media accounts included company and employee profiles on Social Media Site-1 and Social Media Site-2, which identities are known to the Grand Jury. The Social Media Site-1 accounts included "Capsulcn," and "iPharmachineAccount." The Social Media Site-2 accounts included "CapsulCN," "CapsulCN Inc.," "PillMolds," and "Monica Yang." CAPSULCN used these social media accounts to advertise and promote the illegal sale and distribution of its pharmaceutical equipment to its drug-trafficking clientele, offering instructional videos and training materials on how to assemble, set up, operate, and calibrate the equipment.

24.    CAPSULCN communicated with current and prospective customers, including drug traffickers, in the United States and elsewhere, through numerous business enterprises and subscriber e-mail accounts associated with E-mail Service-1, which identity is known to the Grand Jury, and electronic messaging systems that allowed users to exchange text and voice messages, voice calls, and video calls. CAPSULCN used these electronic messaging systems to regularly

communicate with their drug-trafficking clientele about inquiries, orders, shipping, and payment information related to the illegal sale and distribution of pharmaceutical equipment. CAPSULCN's business enterprise e-mail accounts included approximately 100 or more associated accounts that contained "CapsulCN" in the names of the accounts, including but not limited to: capsulcn.sale@[E-mail Service-1].com, capsulcn.sale1@[E-mail Service-1].com, capsulcn.sale2@[E-mail Service-1].com, capsulcn.sale3@[E-mail Service-1].com, capsulcn.sale6@[E-mail Service-1].com, capsulcn.bills@[E-mail Service-1].com, capsulcn.order@[E-mail Service-1].com, capsulcn.[E-Commerce Platform-1]@[E-mail Service-1].com, and [E-Commerce Platform-1]@capsulcn.com. CAPSULCN employees commonly included a business signature block at the bottom of the e-mails they sent to customers that provided the name, address, and contact information of "CapsulCN International Co., Ltd." (Defendant CAPSULCN) and links to the website "www.capsulcn.com" or the CAPSULCN online storefront on E-Commerce Platform-1.

25. Defendant PAN operated the CAPSULCN business e-mail addresses "ricky@capsulcn.com," "capsulcn.order@[E-mail Service-1].com," and "capsulcn.sale2@[E-mail Service-1].com." Defendant PAN's English name, "Ricky Pan," was used as the e-mail "display name" for the e-mail addresses "capsulcn.order@[E-mail Service-1].com" and "capsulcn.sale2@[E-mail Service-1].com," meaning it appeared next to the e-mail addresses when used to send or receive e-mails, i.e., "Ricky Pan <capsulcn.order@[E-mail Service-1].com>" and "Ricky Pan <capsulcn.sale2@[E-mail Service-1].com>." Defendant YANG operated the e-mail addresses "Cici <capsulcn.sale2@[E-Mail Service-1].com>" and "monica@capsulcn.com," and Defendant CHEN operated the e-mail address "inna@capsulcn.com." However, along with other employees and agents of CAPSULCN,

Defendants PAN, YANG, and CHEN operated and used other CapsulCN associated e-mail addresses during the course of the scheme.

26.     Between 2014 and 2020, CAPSULCN held and operated several accounts with Payment Service-1, a United States-based payment service. CAPSULCN's Payment Service-1 accounts were linked to bank accounts located in the People's Republic of China, which enabled CAPSULCN to receive payments in the People's Republic of China for illicit tableting machines, encapsulating machines, and counterfeit prescription die molds from United States customers. Those illicit tableting machines, encapsulating machines, and counterfeit prescription die molds were then shipped to the customers in the United States.

27.     Through these accounts, CAPSULCN made approximately 21,000 sale transactions of pharmaceutical equipment and ingredients which totaled approximately $6.8 million. These transactions occurred on CAPSULCN's store front on E-Commerce Platform-1 and on some of its websites or through its online services to customers who received the equipment in the United States. Many of these transactions were sales of tableting machines, encapsulating machines, and counterfeit prescription die molds. The Payment Service-1 accounts were registered to Defendant PAN's electronic devices and phone numbers and were linked to bank accounts located in the People's Republic of China for purposes of transmitting proceeds of their illegal activity from the United States to the People's Republic of China.

28.     Between approximately January 2017 and September 2022, CAPSULCN shipped over 21,000 packages into the United States, approximately 265 of which were intercepted and seized by U.S. Customs authorities.

29.     CAPSULCN routinely disregarded red flags and explicit information that its machine and die mold customers were in the illicit drug trade. CAPSULCN also routinely

concealed the illicit nature of its machine and die mold sales to these customers to avoid detection by United States law enforcement and increase its customer base and income.

30.    For example, between 2018 and 2021, E-Commerce Platform-1 sent numerous e-mails to the CAPSULCN e-mail accounts stating that some of its listings were removed from the CapsulCN store front on E-Commerce Platform-1 because the listings violated E-Commerce Platform-1's policy on "Encouraging Illegal Activity." The e-mail warning provided to CAPSULCN further stated, in sum and substance, that "listings for custom dies/molds" in addition to "[d]ies/molds/presses/capsule fillers for pills" are not permitted on E-Commerce Platform-1 as "these are restricted to possess under U.S. law."

31.    CAPSULCN took numerous steps to conceal its activities and the identities of its co-conspirators from law enforcement as well as to promote the success of their scheme. These steps included:

a.    using numerous business entity names in the course of importing and distributing its equipment into and throughout the United States, or in the course of receiving payment for its equipment, including the following names or variations of names: CapsulCN, PillMolds, Zhejiang Wisely Machinery Co. Ltd., iPharmachine Corp., Huada Pharmaceutical, CapsulCN International Co., Ltd., Ruian Shanfan Enterprise Management Co. Ltd., Ruian Runfeng Enterprise Management Partnership, Ruian Danfeng Enterprise Management Partnership, and Zhejiang CapsulCN Imp. & Exp Co., Ltd., Wenzhou CapsulCN Imp Exp Co., Ltd., iPharmaMachine Corp., Huada Machines, Rui'an Huada Pharmaceutical Machinery Co., Rui'an Yihai Machinery Co. Ltd., Rui'an Pinxin Machinery Co. Ltd., Rui'an Ruiting Machinery Co. Ltd., Rui'an Shunfeng Packaging Machinery,

Rui'an Wisely Technology Co. Ltd., Rui'an Yihai Machinery Co. Ltd., Wenzhou Shanfan Imp. & Exp. Co. Ltd., and HUADACN Pharmaceutical Machinery Co., Ltd.;

b.      communicating with drug traffickers and co-conspirators through secured lines of communication, including Messaging Service-1, an end-to-end encrypted electronic messaging service; and Messaging Service-2, a Chinese web communications platform that was beyond the reach of United States legal process;

c.      accepting payment through cryptocurrency, which obscured the identities of the buyers and sellers, and through financial institutions based in the People's Republic of China, which were beyond the reach of United States legal process;

d.      accepting payment through one or more United States-based money services businesses to receive money in the People's Republic of China from the United States to promote the illegal sale, distribution, and importation of die molds, tableting machines, encapsulating machines, and other equipment and materials; and

e.      establishing banking relationships in the People's Republic of China to receive customer proceeds to promote the illegal sale, distribution, and importation of die molds, tableting machines, encapsulating machines, and other equipment and materials into the United States.

32.     In order to avoid detection and seizures by U.S. Customs authorities and law enforcement, CAPSULCN employed a variety of methods to smuggle tableting machines, encapsulating machines, counterfeit die molds, and other equipment and materials from the

People's Republic of China to the United States to distribute them to customers, including drug traffickers. These methods included:

a.  falsely manifesting shipments of tableting machines, encapsulating machines, and counterfeit die molds as non-controlled and generic industrial equipment such as hole punchers and packing equipment;

b.  concealing tableting machines and encapsulating machines within bulk freight containing legal goods;

c.  using freight forwarders and re-shippers in the United States, thereby hiding that CAPSULCN and its related entities were the true senders of the equipment;

d.  breaking down tableting machines and encapsulating machines into smaller parts, shipping the parts in separate packages to the United States, and falsely manifesting them as generic machine parts;

e.  failing to file DEA Form 452s for tableting machines and encapsuling machines imported and distributed to customers located in the United States; and

f.  shipping tableting and encapsulating machines from the People's Republic of China to one or more warehouses located in the United States, including a warehouse maintained by Co-Conspirator-6 in California, before mailing them to United States-based customers, including drug-trafficking clientele, who had already purchased the machines. This practice allowed CAPSULCN to avoid detection by United States law enforcement for machines that were not reported to the DEA via Form 452.

33.     The reason that CAPSULCN needed to maintain customer confidentiality in the United States was: "it's illegal . . . . In the US, many tablet machines sold are used to make fake medication . . . [the customers] [c]annot apply at the DEA [smiles][.]"

34.     CAPSULCN falsely represented the United States dollar value of its tableting machines, encapsulating machines, and other equipment to U.S. Customs authorities by providing substantially lower values for the equipment than the actual values that it charged its United States customers. This technique maximized CAPSULCN's United States customer base by decreasing the taxes and duties that its customers had to pay to U.S. Customs authorities for the importation and receipt of the equipment into the United States from the People's Republic of China. CAPSULCN communicated to one of its United-States-based customers, "[a]bout the duties and taxes, usually we will write a low price for customs clearance to reduce the taxes" and if "the real price is $25000 and we may write $6000 or $8000 . . . Some customer will request us to write $3000 . . . Taxes is 25% for capsule filling machine."

35.     To maximize its United States customer base, CAPSULCN, through Defendant YANG, Co-Conspirator-5, and others traveled from the People's Republic of China to the United States to build and maintain relationships with their customers and participate in industry trade shows to promote their products. Defendant YANG, Co-Conspirator-5, and other employees of CAPSULCN also traveled from the People's Republic of China to the United States to meet with customers to offer them training and repairs for previously purchased tableting machines and encapsulating machines.

36.     CAPSULCN, through Defendant PAN, Defendant YANG, Co-Conspirator-2, Co-Conspirator-3, Co-Conspirator-5, and others, sold tableting machines in combination with counterfeit die molds to the same customers. These die molds included the identifying marks and

designs of prescription drugs, such as M30s, Percocet, Xanax, Adderall, and associated brand marks, that contained controlled substances. CAPSULCN sold, and its employees discussed selling, the following counterfeit and scheduled prescription drug die molds to customers in the United States and elsewhere:

| Branded Die Mold | Associated Controlled Substance | Controlled Status |
|---|---|---|
| M15 | oxycodone | Schedule II |
| M30 | oxycodone | Schedule II |
| A215 | oxycodone | Schedule II |
| OC40 | oxycodone | Schedule II |
| OC80 | oxycodone | Schedule II |
| OP8 | oxycodone | Schedule II |
| V4812 | oxycodone | Schedule II |
| K57 | oxycodone | Schedule II |
| M595 | oxycodone | Schedule II |
| K9 | oxycodone | Schedule II |
| AD30 | dextroamphetamine | Schedule II |
| V3601 | hydrocodone | Schedule II |
| WATSON853 | hydrocodone | Schedule II |
| B974 | amphetamine/dextroamphetamine | Schedule II |
| R039 | alprazolam | Schedule IV |
| R86 | alprazolam | Schedule IV |
| S903 | alprazolam | Schedule IV |
| G3722 | alprazolam | Schedule IV |

37.    To avoid increased scrutiny by law enforcement in the United States and the People's Republic of China, CAPSULCN took steps to conceal its sales of both tableting machines and counterfeit die molds, in combination, to the same United States customers. These steps included:

a.    In or around 2020, Defendants PAN and YANG created a new brand called "PillMolds" that was distinct in name from the "CapsulCN" brand but was part of Defendant CAPSULCN's business; under the new "PillMolds" brand, Defendants PAN and YANG created the website domain "www.PillMold.com" and the related

Social Media-2 account "PillMolds" to advertise, sell, and promote counterfeit die molds to drug traffickers in the United States; and

b.    CAPSULCN and its co-conspirators referred its drug-trafficking clientele to YANG to negotiate and complete the sales of counterfeit die molds; these drug-trafficking clientele included customers who had previously purchased tableting machines from CAPSULCN and co-conspirators.

## ACTS IN FURTHERANCE OF THE SCHEME

38.    On or about the following dates, in furtherance thereof, and to effect and conceal the existence of the scheme, the Defendants CAPSULCN, PAN, YANG, CHEN, Co-Conspirator-1, Co-Conspirator-2, Co-Conspirator-3, Co-Conspirator-4, Co-Conspirator-5, Co-Conspirator-6, and others performed acts in the Western District of Texas, Southern District of Texas, Eastern District of Michigan, Central District of California, Northern District of California, District of Connecticut, Southern District of Florida, Northern District of Georgia, the People's Republic of China, and elsewhere, including, but not limited to, the following:

39.    On December 2, 2011 and December 14, 2011, Defendant PAN registered his electronic devices with CAPSULCN Payment Service-1 primary accounts. CAPSULCN registered the Payment-Service-1 primary accounts in the names of Co-Conspirator-1 and Co-Conspirator-1's relative. CAPSULCN Payment Service-1 accounts were used to transfer funds from the United States to the People's Republic of China in exchange for the sales of counterfeit die molds, tableting machines, encapsulating machines, and other equipment and materials that would then be unlawfully smuggled, imported, and distributed to the United States from the People's Republic of China.

40.     On May 17, 2012, Defendant PAN used "capsulcn.sale2@[E-mail Service-1].com" to e-mail a customer who used the moniker "David in the States" and a signature block that provided an address in Troy, Michigan. Defendant PAN included an e-mail attachment bearing the "CapsulCN" logo and containing inventory lists of pharmaceutical equipment and prices, including tableting machines, encapsulating machines, and die molds bearing the marks "M30," "A215," and "V4812," all of which were associated with prescription drugs containing oxycodone.

41.     Between May 13, 2013 and June 5, 2013, CAPSULCN sold a manual encapsulating machine to a customer via the "www.capsulcn.com" website. The customer later responded via e-mail to CAPSULCN at the e-mail addresses "capsulcn.sale1@[E-mail Service-1].com" and "capsulcn.order@[E-mail Service-1].com" and requested a refund, stating, in sum and substance, that the machine had been seized and destroyed upon its entry into the United States because it was "in violation of DEA rules." In response, Co-Conspirator-2 e-mailed the customer and stated, "Sorry to know the package was seized by the custom. So unlucky. :(  Instead of refund, can I reship the machine to you? We think it maybe better to send by EMS (USPS). Let me know please." Co-Conspirator-2 then sent another e-mail to the customer confirming shipment of a new encapsulating machine.

42.     On July 2, 2013, a customer in the United States e-mailed Co-Conspirator-3 at "capsulcn.sale@[E-mail Service-1].com" to purchase die molds bearing the mark "M30," which was associated with a prescription drug containing oxycodone. The customer stated, "If u can make this happen I'm ready to buy now." The customer included three images of exemplar blue "M30" tablets. Co-Conspirator-3 forwarded the customer's e-mail to the e-mail address "Ricky Pan <capsulcn.sale2@[E-mail Service-1].com>." Co-Conspirator-3 then sent an e-mail to the customer agreeing to sell four "M30" die molds for $576 and ship them to the United States.

43.     On May 12, 2014, a customer using the alias "Young Boss" e-mailed Co-Conspirator-3 at "capsulcn.sale2@[E-mail Service-1].com" to purchase counterfeit prescription die molds bearing the marks "XANAX," "R86," "R039," and "G3722," all of which were associated with prescription drugs containing alprazolam. "Young Boss" sent an image depicting a pile of blue and white prescription pills, some of which bore the mark G3722 and stated, "so u  know exactly what I want and how they should look." Co-Conspirator-3 sent an e-mail reply agreeing to manufacture the die molds and sell them to the drug trafficker for a "discount price" of $1,800 via payment to a bank located in the People's Republic of China. "Young Boss" sent a series of payments to CAPSULCN from a Payment Service-1 account that was associated with a billing address in Oakland, California.

44.     Between May 24, 2014, and June 29, 2014, Co-Conspirator-4 used "capsulcn.sale1@[E-mail Service-1].com" to e-mail a customer about the manufacture and sale of excipient, rotary tableting machines, custom die molds, and die molds bearing the marks of prescription drugs associated with controlled substances. Co-Conspirator-4's e-mail bore a signature block showing the business name, address, and contact information of "CapsulCN International Co., Ltd." (Defendant CAPSULCN) and a link to the website "www.capsulcn.com." In one e-mail, the customer asked, "can I have word [[Fentanyl]] on one side and [[ 12 ]] on the other"? In response, Co-Conspirator-4 sent an e-mail agreeing to manufacture and sell the custom "Fentanyl" die mold along with another custom die mold to the drug trafficker for a price of $289. In a follow-up e-mail, the customer made payment via an international wire transaction from Connecticut to the People's Republic of China to promote the production and distribution of the "Fentanyl" die mold. The customer e-mailed Co-Conspirator-4 and commented that the custom "Fentanyl" die mold was "perfect."

45.    Between November 2, 2014 and November 26, 2014, the customer "Young Boss" sent an e-mail to "capsulcn.sale2@[E-mail Service-1].com" to place a purchase order for multiple TDP5 tableting machines and counterfeit die molds bearing the marks "R039" and "S903," which were associated with prescription drugs containing alprazolam. During their negotiation, "Young Boss" sent a message that stated, in sum and substance, "I just made payment please send me my parcels in a timely fashion it is urgent. Also please DO NOT I REPEAT DO NOT SEND DIE MOLDS WITH THE MACHINCE! [sic] ALSO LABKE [sic] MACHINES AS SEWING MACHINES. PLEASE SEND ME THE STAMPS FIRST IF POSSIBLE ESPECIALLY S903 THEN SEND MACHINES[.]" In an e-mail response, an employee of Defendant CAPSULCN, using the "capsulcn.2@[E-mail Service-1].com" e-mail address, agreed to sell the counterfeit die molds and machines to "Young Boss" and ship them to a location in the United States, stating "[w]e will ship you the molds in stock from China and we will make you the molds we don't have now . . . we will ship your 2 sets of machines from our CA storage but the name is Hole Punch which is very safe just like sewing machine." "Young Boss" sent a series of payments to CAPSULCN from a Payment Service-1 account that was associated with a billing address in Oakland, California.

46.    Between March 2015 and May 2015, Co-Conspirator-2 exchanged messages using Messaging Service-3, whose identity is known to the Grand Jury, with a customer who stated he was "sitting in a prison cell with a cell phone" and was concerned about tableting machines that he recently purchased from CAPSULCN that had been seized by Canadian customs authorities. The customer sent a message to Co-Conspirator-2 stating that the payment for the machines "came from usa client . . . Drug deal . . . Tell them paid cash." The customer and Co-Conspirator-2 sent additional Messaging Service-3 messages that discussed how Co-Conspirator-2 could create proof

of payment to help disguise the nature of the funds so that the customer could retrieve the machines from the Canadian customs authorities. CAPSULCN continued to sell the customer die molds bearing the marks of counterfeit prescription drugs and agreed to ship them to a location in Atlanta, Georgia.

47.     Between approximately October 2014 and June 2015, CAPSULCN used its Payment Service-1 accounts to receive funds from a customer based in Long Beach, California, to promote the sale, distribution, and importation of illicit tableting machines, encapsulating machines, counterfeit die molds, and associated parts. Specifically, CAPSULCN used its Payment Service-1 to receive approximately $27,000 from the customer and the customer's associate for approximately forty-one illicit sales of products, including a ZP-5A rotary tableting machine capable of manufacturing approximately 388,800 tablets per day, a granulator, tableting machine parts, and counterfeit prescription die molds bearing marks that included "M30" and "A215," which were associated with prescription drugs containing oxycodone, and "Watson853," which was associated with a prescription drug containing hydrocodone.

48.     Between April 4, 2015, and April 22, 2015, Defendant YANG used the messaging account "capuslcn.sale7 Cici Yang" associated with Messaging Service-3 to discuss the sale of counterfeit prescription die molds with the same customer who was located in Long Beach, California. On April 5, 2022, CAPSULCN sold via its E-Commerce Platform-1 store front a "V4812 DIE MOLD FOR SINGLE PUNCH TABLET PRESS MACHINE TDP1.5/5/6 CapsulCN" for $99 to this customer. On April 22, 2015, Defendant YANG sent a message to the customer stating, "Ok, please give me the delivery address for v4812 and M30 (ZP-5A) first, I will send those die mold today." The die molds bearing the marks "V4812" and "M30" were associated with prescription drugs containing oxycodone.

49.    On July 14, 2015, CAPSULCN directed payment for a "G3722" die mold set to Payment Services-1 account ending in -6429, an account controlled by Defendant PAN. The mark "G3722" is associated with a prescription drug containing alprazolam. The customer provided a shipping address associated with the payment that was located in the Western District of Texas.

50.    On September 20, 2015, CAPSULCN directed payment for a "K9" die mold set to Payment Services-1 account ending in -6142, an account controlled by Defendant PAN. The mark "K9" is associated with a prescription drug containing oxycodone. The customer provided a shipping address associated with the payment that was located in the Western District of Texas.

51.    On December 31, 2015, CAPSULCN directed payment for a "XANAX" die mold set to Payment Services-1 account ending in -6142, an account controlled by Defendant PAN. The mark "XANAX" is associated with a prescription drug containing alprazolam. The customer provided a shipping address associated with the payment that was located in the Western District of Texas.

52.    Between May 23, 2016 and November 11, 2016, Defendant YANG and other members of CAPSULCN e-mailed a customer about the sale of tableting machines, mixers, excipient, and die molds bearing the marks of prescription drugs containing controlled substances. Defendant YANG used several CAPSULCN e-mail accounts associated with E-Mail Provider-1, all of which contained a business signature block that included the name, address, and contact information of "CapsulCN International Co., Ltd." (Defendant CAPSULCN) and a link to CAPSULCN's online store front on E-Commerce Platform-1. Defendant YANG sent an e-mail to the customer providing a list of approximately nineteen types of die molds that were in stock, including those bearing the marks "OC40" (oxycodone), "AD30" (dextroamphetamine), "M595" (oxycodone), "XANAX" (alprazolam), and "M30" (oxycodone). The customer sent a follow-up

e-mail inquiring about the availability of excipient that could replicate the "feel" of oxycodone prescription pills, stating, "Ok please check with your tech or whoever I wana know how close of a mix do you have for what I wana do it doesn't have to be perfect but they must feel like there on a oxy." In a later e-mail to the customer, Defendant YANG stated, "Also what type of tablet press machine you want?" and included an attached image depicting a white prescription pill bearing the mark "K57," which was associated with a prescription drug containing oxycodone. In multiple e-mails to the customer, CAPSULCN provided payment confirmation for the sales of these products from the e-mail account "Ricky Pan <capsulcn.bills@[E-Mail Provider-1].com."

53.    Between September 13, 2016 and September 29, 2016, Defendant YANG sent e-mails to a customer about a sale of a ZP-9 rotary tableting machine—capable of producing approximately 388,800 pills per day—for the price of $7,250, stating, in sum and substance, that she could meet with the customer in the United States to discuss the sale and build "trust." During these communications, Defendant YANG used several CAPSULCN e-mail accounts associated with E-mail Provider-1 and a business signature block that used the name, address, and contact information of "CapsulCN International Co., Ltd." (Defendant CAPSULCN). Defendant YANG also sent the customer a link to a video of its pill "counter" machine on its Social Media Site-2 channel and asked the customer about the rotary tableting machine, "do you have DEA number, if not, the price will be higher." Defendant YANG provided the customer's prior transaction history of die molds, including a set bearing the mark "G3722," which was associated with a prescription drug containing alprazolam. The customer previously sent a payment to CAPSULCN for the purchase of a part to a TDP5 tableting machine from a Payment Service-1 account that was associated with a billing address in Houston, Texas.

54.     Between October 4, 2016 and October 7, 2016, Co-Conspirator-5 used the e-mail account "capsulcn.social@[E-mail Provider-1].com" to forward a customer's e-mail to Defendant YANG, in which the customer stated he had "noticed" CAPSULCN's products on E-Commerce Platform-1 and asked if CAPSULCN could supply him with several counterfeit die molds, including those bearing the marks "M30" (oxycodone), "AD30" (dextroamphetamine), and "G3722" (alprazolam), along with excipient in colors matching the identifying marks of prescription drugs associated with these marks. In response, Defendant YANG sent an e-mail to the customer that stated, "[r]ight now die mold in 20% off" and agreed to sell the machine and die molds to the customer for $541 and ship them to Connecticut. Defendant YANG also stated about excipient, "[w]e also have binder for sell," and asked what color the customer wanted. In reply, the customer stated, "I don't know the color numbers but if you can figure it out from the m30 picture I sent you[.]" The customer eventually accepted different colored excipient from CAPSULCN, stating, "just send standard blue,yellow [sic] and red dyes, I'll just have to mix myself I guess. thanks[.]" The customer provided a shipping address in New Haven, Connecticut, and confirmed via e-mail to Defendant YANG that payment was made to CAPSULCN via Payment System-1.

55.     In March 2017, Co-Conspirator-5 exchanged messages via Messaging Service-3 with a customer about the sale of a tableting machine, tablet machine parts, and a die mold. Co-Conspirator-5's messaging account used a profile picture that showed the brand name and logo of "CAPSULCN." The customer sent a message to Co-Conspirator-5 stating, "[c]an you also find out about them parts for me. I need them." Co-Conspirator-5 replied, "Yes the parts will be sent together with this machine." Approximately two days later, Co-Conspirator-5 sent a Messaging Service-3 message to the customer, stating, "Is the die you need is A215?" The mark "A215" was

associated with a prescription drug containing oxycodone. The customer and his conspirators sent international wire payments totaling $18,000 to CAPSULCN from the United States to the People's Republic of China in exchange for a tableting machine, tablet machine parts, and a die mold.

56.     On February 4, 2018, a customer e-mailed Defendant YANG at the e-mail address "Cici <capsulcn.sale2@[E-mail Service-1].com>," and asked, "I need a press that's fast and automatic, what are the cheapest options you can offer? On your site i only see capsule stuff[.]" In response, Defendant YANG sent an e-mail stating, "Good day. Do you need TDP-5 machine? Because Sensitive item,so [sic] we only do it off-[E-Commerce Platform-1] line. Best Regards, Cici[.]" In previous e-mails within the same e-mail thread, Defendant YANG messaged the customer and offered to sell counterfeit die molds that bore the marks "M15," "M30," and "OP8" which were associated with prescription drugs containing oxycodone, and "AD30," which was associated with a prescription drug containing dextroamphetamine, During these communications, Defendant YANG used a business signature block that used the name, address, and contact information of "CapsulCN International Co., Ltd." (Defendant CAPSULCN) along with a link to the CAPSULCN online store front on E-Commerce Platform-1.

57.     On December 1, 2020, Co-Conspirator-5 participated in a group chat via Messaging Service-1 with another CAPSULCN representative and a customer about the sale of an automatic encapsulating machine and its practice of first shipping machines to a United States warehouse for customers who could not obtain approval to purchase machines from the DEA via the required Form 452. As explained by the CAPSULCN representative, "If we send it from China to USA, you have to get DEA permission . . . Without DEA permission, customs will seize the filler . . . 1) if you can wait for 10 days for the filler arrives in our USA warehouse, no need DEA permission .

. . 2) if you cannot wait and want us to send it [t]o you from China, then you need to get DEA permission."

58.     Between July 7, 2020 and March 3, 2021, Co-Conspirator-5 communicated via Messaging Service-1 with a customer about the sale of tableting machine components, counterfeit die molds, and other counterfeit drug making equipment, such as automatic hoppers and granulators. In a series of Messaging Service-1 messages, the customer asked for "M30" die molds and instructed Co-Conspirator-5 to "Never send nothing under my name" to avoid U.S. Customs authorities from seizing his packages. After asking for "M30" die molds, the customer said he received a link to "pillmold.com." Co-Conspirator-5 verified that the website "pillmolds.com" was associated with Defendant YANG: "I asked Monica and you are okay to do business with her . . . She enters into mold business now." Die molds bearing the mark "M30" were associated with a prescription drug containing oxycodone. CAPSULCN sold multiple tableting machine components and related equipment to the customer and shipped the equipment to several locations in Miami, Florida.

59.     On January 6, 2021 and March 24, 2021, Co-Conspirator-5 sold an automatic tableting machine and sets of die molds to a customer who was an associate of Co-Conspirator-6. Co-Conspirator-5 sent several messages to the customer via Messaging Service-1 agreeing to ship the machine and die molds in multiple packages to avoid detection by U.S. Customs authorities. Co-Conspirator-5 also sent the customer a Messaging Service-1 message containing the hyperlink to a video on one of CAPSULCN's channels on Social Media Site-2 depicting assembly instructions for the machine. In response, the customer messaged Co-Conspirator-5 stating, "Ok i watched the video. Seems very easy to do[.]" Co-Conspirator-5 shipped the machine and die molds to Co-Conspirator-6's business location in Stanton, California.

60.    Between April 2021 and September 2021, Co-Conspirator-5 sent numerous messages via Messaging Service-1 to a customer about the sale of counterfeit die molds. Co-Conspirator-5 agreed to ship a new set of "AD30" die molds to the customer under a name that Co-Conspirator-5 knew to be false. Co-Conspirator-5 subsequently sold and shipped the customer approximately eighteen sets of "AD30" and "dp30" die molds for $2,520. The "AD30" and "dp30" marks were associated with a prescription drug containing dextroamphetamine. Co-Conspirator-5 agreed to send the counterfeit die molds to the customer "one by one in case there is customs problem." Co-Conspirator-5 also agreed to receive payment from the customer through their mutual associate, Co-Conspirator-6, and ship the packages to Co-Conspirator-6's business location in Stanton, California.

61.    On December 17, 2022, Co-Conspirator-5 engaged in Messaging Service-1 communications with a customer about the sale of an encapsulating machine. The customer sent Co-Conspirator-5 a Messaging Service-1 message stating, "[g]ood morning . . . I am looking into other options. Our company is not set up yet to be able to go through the DEA process. I'd like to be more established before going through the process. Currently looking into alternative options. I will get back to you shortly." In a follow-up message, the customer asked, "Could we ship the machine out in parts and declare parts of a machine as opposed to a whole capsule machine? Is that a way around filling the form?" In response, Co-Conspirator-5 replied, "I will try this way. But I think there is a risk[.]" In response, the customer stated, "I wouldn't have a reason to apply as a person . . . would need a reason to use the machine." Co-Conspirator-5 responded, "[o]kay. We will try to ship the machine as parts and not showing the name." In a wire transaction coordinated by Co-Conspirator-5 that promoted the distribution and importation of the smuggled encapsulation machine, the customer sent a $7,449 international wire from a United States bank

account into a bank account in the People's Republic of China that was held in the name of "CapsulCN International Co., Ltd." (Defendant CAPSULCN).

62.     Between June 6, 2023 and September 20, 2023, in the Western District of Texas, an undercover law enforcement agent ("UCA1") messaged CAPSULCN via Messaging Service-1 to buy an automatic tableting machine and counterfeit prescription die molds. Defendant YANG sent messages via Messaging Service-1 to UCA1 in which she agreed to sell a TDP5 automatic tableting machine and a counterfeit prescription die mold set bearing the mark "M30." which was associated with a prescription drug containing oxycodone. After learning that the UCA1 could not obtain a DEA registration number for the tableting machine and was therefore not authorized to lawfully receive and import a tableting machine, Defendant YANG agreed to dismantle and ship the TDP5 machine as separate components. Defendant YANG then sent a message that provided UCA1 with a bitcoin wallet address to promote the unlawful shipment and importation of the TDP5 machine and die molds. UCA1 remitted payment, and Defendant YANG confirmed receipt of the payment. UCA1 received one package containing two counterfeit M30 die mold sets and three packages containing the parts of the disassembled TDP5 machine. These products were received by UCA1 in the Western District of Texas.

63.     Between August 30, 2023 and November 14, 2023, in the Western District of Texas, and using the same undercover identity, UCA1 messaged CAPSULCN via Messaging Service-1 to buy an automatic tableting machine. Defendant CHEN sent messages to UCA1 in which she agreed to sell UCA1 a TDP1.5 automatic tableting machine. After learning that UCA1 could not obtain a DEA registration number for the machine and therefore understanding that the UCA was not authorized to lawfully receive and import a tableting machine, Defendant CHEN agreed to ship the machine to UCA1 under a false manifest and separate the machine into three packages to

be shipped on separate days to avoid detection by U.S. Customs, stating UCA1 had to "take full responsibility of the high risk of shipment." Defendant CHEN then sent a message to UCA1 directing the UCA to conduct a $1,657 international wire into a bank account held on behalf of "CapsulCN International Co., Ltd." (Defendant CAPSULCN) at a bank in the People's Republic of China to promote the illegal importation and distribution of the machine. UCA1 later received the three separate packages containing the parts of the disassembled TDP1.5 machine in the Western District of Texas.

64.     Between February 8, 2024 and June 7, 2024, in the Western District of Texas, a different undercover agent using a different undercover identity ("UCA2") messaged CAPSULCN to buy counterfeit prescription die molds. Defendant YANG sent a message to UCA2 stating, "[h]ello friend, do you need to purchase AD30 tablet press molds?" The mark "AD30" was associated with a prescription drug containing dextroamphetamine. Defendant YANG sent a message to UCA2 agreeing to sell the UCA2 two counterfeit prescription die mold sets and directed UCA2 to make an international money transfer from the United States to an individual located in the People's Republic of China to promote the illegal distribution and importation of the die mold sets. Defendant YANG shipped UCA2 two packages. Each package contained one "AD30" die mold set.  Defendant YANG falsely labeled the packages as "balance bar" and "bolt," respectively, to avoid detection by the U.S. Customs authorities. The UCA received the packages containing the "AD30" die mold sets in the Western District of Texas. Following the transaction, Defendant YANG offered to sell UCA2 a TDP5 tableting machine and offered to give UCA2 "a set of m30 molds as a gift, worth more than 100 US dollars." The mark "M30" was associated with a prescription drug containing oxycodone.

**COUNT ONE**
**(Conspiracy to Smuggle Equipment and Materials Used to Manufacture Controlled Substances into the United States)**

65.      The allegations contained in Paragraph 1 through Paragraph 64 of this Indictment are realleged and incorporated herein, as though set forth in their entirety.

66.      From on or about December 2, 2011, to the Present, the exact dates unknown, in the Western District of Texas, Southern District of Texas, Eastern District of Michigan, Central District of California, Northern District of California, District of Connecticut, the Southern District of Florida, Northern District of Georgia, the People's Republic of China, and elsewhere, Defendants **CAPSULCN INTERNATIONAL CO., LTD.**, also known as CapsulCN, PillMolds, Zhejiang Wisely Machinery Co. Ltd., iPharmachine Corp., Huada Pharmaceutical, Ruian Shanfan Enterprise Management Co. Ltd., Ruian Runfeng Enterprise Management Partnership, Ruian Danfeng Enterprise Management Partnership, Zhejiang CapsulCN Imp. & Exp Co., Ltd., and HUADACN Pharmaceutical Machinery Co., Ltd.; **XIAOCHUAN PAN**, also known as "潘肖川" and "Ricky Pan;" **TINGYAN YANG**, also known as "杨挺燕," "Monica Yang, and "Cici;" and **XI CHEN**, also known as also known as "晨曦" and "Inna;" Co-Conspirator-1; Co-Conspirator-2; Co-Conspirator-3; Co-Conspirator-4; Co-Conspirator-5; and Co-Conspirator-6; together with others known and unknown to the Grand Jury, in violation of Title 18, United States Code, Section 371, conspired and agreed with each other to commit an offense against the United States, to wit: smuggling, in violation of Title 18, United States Code, Section 545, which was:

a.      to knowingly and willfully, with intent to defraud the United States, smuggle and clandestinely introduce and attempt to smuggle and clandestinely introduce into the United States merchandise which should have been invoiced, and made out and

passed and attempted to pass, through the customhouse any false, forged, or fraudulent invoice, or other document or paper; and

b.      to fraudulently and knowingly import and bring into the United States merchandise contrary to any law and regulation of the United States, to wit: violations of Title 21, United States Code, Sections 843(a)(5) and 843(a)(7).

<u>**MANNER AND MEANS OF THE CONSPIRACY**</u>

67.      The manner and means of the conspiracy were the same as the manner and means of the scheme. Accordingly, Paragraphs 22-37 are re-alleged and are incorporated by reference as if fully set forth herein.

<u>**OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY**</u>

68.      In furtherance of the conspiracy, Defendants **CAPSULCN INTERNATIONAL CO., LTD.,** also known as CapsulCN, PillMolds, Zhejiang Wisely Machinery Co. Ltd., iPharmachine Corp., Huada Pharmaceutical, Ruian Shanfan Enterprise Management Co. Ltd., Ruian Runfeng Enterprise Management Partnership, Ruian Danfeng Enterprise Management Partnership, Zhejiang CapsulCN Imp. & Exp Co., Ltd., and HUADACN Pharmaceutical Machinery Co., Ltd.; **XIAOCHUAN PAN**, also known as "潘肖川" and "Ricky Pan;" **TINGYAN YANG**, also known as "杨挺燕," "Monica Yang, and "CiCi;" and **XI CHEN**, also known as also known as "晨曦" and "Inna;" Co-Conspirator-1; Co-Conspirator-2; Co-Conspirator-3; Co-Conspirator-4; Co-Conspirator-5; and Co-Conspirator-6;   together with others known and unknown to the Grand Jury, engaged in at least one of the acts taken in furtherance of the scheme. Accordingly, Paragraphs 39-64 are re-alleged and are incorporated by reference as if fully set forth herein.

## COUNTS TWO THROUGH SIX
### (Smuggling of Equipment Used to Manufacture Controlled Substances into the United States)

69.     The allegations contained in Paragraph 1 through Paragraph 64 of this Indictment are realleged and incorporated herein, as though set forth in their entirety.

70.     On or about the dates referenced below, in the Western District of Texas, the below-named Defendants, aided and abetted by each other and others, known or unknown:

a.   knowingly and willfully, with intent to defraud the United States, smuggled and clandestinely introduced and attempted to smuggle and clandestinely introduce into the United States merchandise which should have been invoiced, and made out and passed and attempted to pass, through the customhouse any false, forged, or fraudulent invoice, or other document or paper; and

b.   fraudulently and knowingly imported and brought into the United States merchandise contrary to any law and regulation of the United States, to wit: in violation of Title 21, United States Code, Sections 843(a)(5) and 843(a)(7),

in violation of Title 18, United States Code, Sections 545 and 2.

| COUNT | DATE (on or about) | DEFENDANTS | SMUGGLING ACT |
|---|---|---|---|
| 2 | 07/27/2023 | **CAPSULCN XIAOCHUAN PAN TINGYAN YANG** | Importation of M30 dies shipped to undercover agent with documentation declaring the contents of the shipment as "sofa cover" which was associated with Bill of Lading Number 180-34344450-80329701479. |
| 3 | 09/15/2023 | **CAPSULCN XIAOCHUAN PAN TINGYAN YANG** | Importation of a disassembled TDP5 tableting machine shipped in three shipments with documentation declaring the contents of the shipments as "machine accessories" which was associated with SAIA Pro Number 770566923505. |

| 4 | 11/11/2023 11/20/2023 11/27/2023 | **CAPSULCN XIAOCHUAN PAN XI CHEN** | Importation of disassembled TDP1.5 tableting machine in three shipments to undercover agent with documentation declaring the contents of the three shipments as "electric motor," "packing machine frame," and "accessories (handwheel, hopper shaft motor board)," respectively, which was associated with Bill Numbers: 70958510, 52699076, and 90369064. |
| 5 | 04/25/2024 | **CAPSULCN XIAOCHUAN PAN TINGYAN YANG** | Importation of set of AD30 dies to undercover agent with documentation declaring the contents of each shipment as "balance bar" which was associated with Bill of Lading Number 180-34328582-60392090649. |
| 6 | 05/29/2024 | **CAPSULCN XIAOCHUAN PAN TINGYAN YANG** | Importation of set of AD30 dies to undercover agent with documentation declaring the contents of each shipment as "bolt" which was associated with Bill of Lading Number 988-02312785-0395059508. |

## COUNT SEVEN
### (Conspiracy to Violate the Controlled Substances Act)

71.    The allegations contained in Paragraph 1 through Paragraph 64 of this Indictment are realleged and incorporated herein, as though set forth in their entirety.

72.    From on or about December 2, 2011, to the Present, the exact dates unknown, in the Western District of Texas, Southern District of Texas, Eastern District of Michigan, Central District of California, Northern District of California, District of Connecticut, the Southern District of Florida, Northern District of Georgia, the People's Republic of China, and elsewhere, Defendants **CAPSULCN INTERNATIONAL CO., LTD.**, also known as CapsulCN, PillMolds, Zhejiang Wisely Machinery Co. Ltd., iPharmachine Corp., Huada Pharmaceutical, Ruian Shanfan Enterprise Management Co. Ltd., Ruian Runfeng Enterprise Management Partnership, Ruian Danfeng Enterprise Management Partnership, Zhejiang CapsulCN Imp. & Exp Co., Ltd., and HUADACN Pharmaceutical Machinery Co., Ltd.; **XIAOCHUAN PAN**, also known as "潘肖川"

and "Ricky Pan;" **TINGYAN YANG**, also known as "杨挺燕," "Monica Yang, and "Cici;" and

**XI CHEN**, also known as also known as "晨曦" and "Inna;" Co-Conspirator-1; Co-Conspirator-2;

Co-Conspirator-3; Conspirator-4; Co-Conspirator-5; and Co-Conspirator-6; together with others

known and unknown to the Grand Jury, in violation of Title 21, United States Code, Section 846,

knowingly and intentionally conspired and agreed to:

    a.    distribute any die and other thing designed to print, imprint and reproduce the

trademark, trade name, and other identifying mark and imprint of another and any

likeness of any of the foregoing upon any drug and labeling thereof so as to render

such drug a counterfeit substance, in violation of Title 21, United States Code,

Section 843(a)(5);

    b.    distribute, and import a tableting machine, encapsulating machine, and any other

equipment which may be used to manufacture a controlled substance, knowing,

intending, and having reasonable cause to believe, that it will be used to

manufacture a controlled substance, in violation of Title 21, United States Code,

Section 843(a)(7); and

    c.    use a communication facility in facilitating the commission of any act and acts

constituting a felony under Title 21, United States Code, Sections 841 *et seq.*, to

wit: the violations of Title 21, United States Code, Sections 843(a)(5) and 843(a)(7),

in violation of Title 21, United States Code, Section 843(b); which communication

facilities included, but were not limited to the:

        i.    Domains: "capsulcn.com," "huadapharma.com," "pillmold.com," and
"iPharmachine.com;"

        ii.    E-Commerce Platform-1 store fronts: "capsulcn" and "capsulcn-sale;"

        iii.    E-mail Service-1 subscriber and enterprise e-mail accounts; and

iv.  Messaging System-1, Messaging System-2, and Messaging System-3 messaging services.

## COUNT EIGHT
### (Continuing Criminal Enterprise)

73.    The allegations contained in Paragraph 1 through Paragraph 64 of this Indictment are realleged and incorporated herein, as though set forth in their entirety.

74.    From on or about December 2, 2011, to the Present, the exact dates unknown, in the Western District of Texas, Southern District of Texas, Eastern District of Michigan, Central District of California, Northern District of California, the District of Connecticut, the Southern District of Florida, the Northern District of Georgia, the People's Republic of China, and elsewhere, the Defendant **XIAOCHUAN PAN**, also known as "潘肖川" and "Ricky Pan," together with others known and unknown to the Grand Jury, did knowingly and intentionally engage in a continuing criminal enterprise, in that Defendant **XIAOCHUAN PAN** committed violations of Title 21, United States Code, Sections 843(a)(5), 843(a)(7), and 843(b), which include the violations in Counts Nine through Eighteen set forth below, and which violations were part of a continuing series of violations of those statutes undertaken by Defendant **XIAOCHUAN PAN** in concert with five or more other persons, with respect to whom Defendant **XIAOCHUAN PAN** occupied a supervisory and management position, and was a principal administrator, organizer and leader of the continuing criminal enterprise, and from which continuing series of violations Defendant **XIAOCHUAN PAN** obtained substantial income and resources, in violation of Title 21, United States Code, Section 848.

## COUNTS NINE THROUGH TWELVE
### (Distribution of Counterfeit Die Molds)

75.    The allegations contained in Paragraph 1 through Paragraph 64 of this Indictment are realleged and incorporated herein, as though set forth in their entirety.

76.    On or about the dates referenced below, in the Western District of Texas, the below-named Defendants, aided and abetted by each other and others known or unknown, knowingly or intentionally distributed any punch, die, plate, stone, and other thing designed to print, imprint and reproduce the trademark, trade name, and other identifying mark and imprint of another and any likeness of any of the foregoing upon any drug and labeling thereof so as to render such drug a counterfeit substance, in violation of Title 21, United States Code, Section 843(a)(5), and Title 18, United States Code, Section 2.

| COUNT | DATE (on or about) | DEFENDANTS | PROHIBITED ACT |
|---|---|---|---|
| 9 | 07/27/2023 | **CAPSULCN XIAOCHUAN PAN TINGYAN YANG** | Importation of set of M30 dies associated with Bill of Lading Number 180-34344450-80329701479. |
| 10 | 07/27/2023 | **CAPSULCN XIAOCHUAN PAN TINGYAN YANG** | Importation of set of M30 dies associated with Bill of Lading Number 180-34344450-80329701479. |
| 11 | 04/25/2024 | **CAPSULCN XIAOCHUAN PAN TINGYAN YANG** | Importation of set of AD30 dies associated with Bill of Lading Number 180-34328582-60392090649. |
| 12 | 05/29/2024 | **CAPSULCN XIAOCHUAN PAN TINGYAN YANG** | Importation of set of AD30 dies associated with Bill of Lading Number 988-02312785-0395059508. |

## COUNTS THIRTEEN AND FOURTEEN
### (Importation and Distribution of Tableting Machines into the United States)

77.    The allegations contained in Paragraph 1 through Paragraph 64 of this Indictment are realleged and incorporated herein, as though set forth in their entirety.

78.    On or about the dates referenced below, in the Western District of Texas, the below-named Defendants, aided and abetted by each other and others known or unknown, did knowingly or intentionally import or distribute any tableting machine or any equipment, product, or material which may be used to manufacture a controlled substance or listed chemical, knowing,

intending, or having reasonable cause to believe, that it will be used to manufacture a controlled

substance or listed chemical, in violation of Title 21, United States Code, Section 843(a)(7), and

Title 18, United States Code, Section 2.

| COUNT | DATE (on or about) | DEFENDANTS | PROHIBITED ACT |
|---|---|---|---|
| 13 | 09/15/2023 | **CAPSULCN XIAOCHUAN PAN TINGYAN YANG** | Importation and distribution of one disassembled TDP5 tableting machine which was associated with SAIA Pro Number 770566923505. |
| 14 | 11/11/2023 11/20/2023 11/27/2023 | **CAPSULCN XIAOCHUAN PAN XI CHEN** | Importation and distribution of one disassembled TDP1.5 tableting machine in three shipments which was associated with Bill Numbers: 70958510, 52699076, and 90369064. |

### COUNTS FIFTEEN – EIGHTEEN
**(Use of a Communication Facility in Committing, Causing, or Facilitating any Controlled Substances Felony)**

79.    The allegations contained in Paragraph 1 through Paragraph 64 of this Indictment

are realleged and incorporated herein, as though set forth in their entirety.

80.    On or about the dates referenced below, in the Western District of Texas, the

below-named Defendants, aided and abetted by each other and others known or unknown, did

knowingly or intentionally use a communication facility in facilitating the commission of any act

or acts constituting a felony under Title 21, United States Code, Sections 841 *et seq.*, to wit: the

violations of Title 21, United States Code, Sections 843(a)(5) and 843(a)(7), in violation of Title

21, United States Code, Section 843(b), and Title 18, United States Code, Section 2.

| COUNT | DATE (on or about) | DEFENDANTS | PROHIBITED ACT |
|---|---|---|---|
| 15 | 06/06/2023 through | **CAPSULCN XIAOCHUAN PAN TINGYAN YANG** | Defendant YANG sent a series of electronic messages to undercover agent in which she agreed to sell a TDP5 automatic tableting machine, and a counterfeit prescription die |

| | | | |
|---|---|---|---|
| | 09/25/2023 | | mold set bearing the mark "M30," which was associated with a prescription drug containing oxycodone, a Schedule II controlled substance. |
| 16 | 09/03/2023 through 10/12/2023 | **CAPSULCN XIAOCHUAN PAN XI CHEN** | Defendant CHEN sent a series of electronic messages to undercover agent in which she agreed to sell a TDP1.5 automatic tableting machine and ship it in multiple parts. |
| 17 | 02/06/2024 through 09/25/2024 | **CAPSULCN XIAOCHUAN PAN TINGYAN YANG** | Defendant YANG sent a series of electronic messages to undercover agent in which she agreed to sell a counterfeit prescription die mold set bearing the mark "AD30," which was associated with a prescription drug containing dextroamphetamine, a Schedule II controlled substance. |
| 18 | 08/23/2024 | **CAPSULCN XIAOCHUAN PAN TINGYAN YANG** | Defendant YANG sent an electronic message to undercover agent providing a link to the website https://pillmold.com, which listed the inventory of CAPSULCN's counterfeit prescription die molds. |

## COUNT NINETEEN
**(Conspiracy to Commit International Promotional Money Laundering)**

81.    The allegations contained in Paragraph 1 through Paragraph 64 of this Indictment are realleged and incorporated herein, as though set forth in their entirety.

82.    From on or about December 2, 2011, to the Present, the exact dates unknown, in the Western District of Texas, Central District of California, Southern District of Florida, the People's Republic of China, and elsewhere, the Defendants **CAPSULCN INTERNATIONAL CO., LTD.**, also known as CapsulCN, PillMolds, Zhejiang Wisely Machinery Co. Ltd., iPharmachine Corp., Huada Pharmaceutical, Ruian Shanfan Enterprise Management Co. Ltd., Ruian Runfeng Enterprise Management Partnership, Ruian Danfeng Enterprise Management Partnership, Zhejiang CapsulCN Imp. & Exp Co., Ltd., and HUADACN Pharmaceutical Machinery Co., Ltd.; **XIAOCHUAN PAN**, also known as "潘肖川" and "Ricky Pan;" **TINGYAN**

YANG, also known as "杨挺燕," "Monica Yang, and "Cici;" and **XI CHEN**, also known as also

known as "晨曦" and "Inna,"  and Co-Conspirator-5;" together with others known and unknown

to the Grand Jury, did knowingly, intentionally, and unlawfully conspire, combine, confederate, or

agree with each other to commit an offense against the United States, in violation of Title 18,

United States Code, Section 1956(h), that is, Defendants conspired to transport, transmit, and

transfer, and attempted to transport, transmit, and transfer a monetary instrument and funds from

a place in the United States to and through a place outside the United States with the intent to

promote the carrying on of specified unlawful activity, to wit the violations of Title 21, United

States Code, Sections 843(a)(5), 843(a)(7), 843(b), 846, and 848, and Title 18, United States Code,

Section 545, in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 1956(h).

## COUNTS TWENTY – TWENTY-ONE
### (International Promotional Money Laundering)

83.     The allegations contained in Paragraph 1 through Paragraph 64 of this Indictment

are realleged and incorporated herein, as though set forth in their entirety.

84.     On or about the dates referenced below, in the Western District of Texas, the

People's Republic of China, and elsewhere, the below-named Defendants, aided and abetted by

each other and others known or unknown, did transport, transmit, and transfer, and attempted to

transport, transmit, and transfer a monetary instrument and funds from a place in the United States

to and through a place outside the United States with the intent to promote the carrying on of

specified unlawful activity, to wit the violation of Title 21, United States Code, Sections 843(a)(5),

843(a)(7), and 846, and Title 18, United States Code, Section 545, in violation of Title 18, United

States Code, Sections 1956(a)(2)(A) and 2.

| COUNT | DATE (on or about) | DEFENDANTS | PROHIBITED ACT |
|-------|--------------------|------------|----------------|
| 20 | 10/04/2023 | **CAPSULCN** **XIAOCHUAN PAN** **XI CHEN** | Wire transfer in the amount of approximately $1,644 from bank account held in the United States to an account held on behalf of CAPSULCN at Citibank in Hong Kong. |
| 21 | 04/10/2024 | **CAPSULCN** **XIAOCHUAN PAN** **TINGYAN YANG** | Money transfer in the amount of approximately $249 from money service business located in the United States to an individual located in the People's Republic of China. |

### NOTICE OF GOVERNMENT'S DEMAND FOR FORFEITURE
**[*See* Fed. R. Crim. 32.2]**

**I.**
### Smuggling Violations and Forfeiture Statutes
**[Title 18 U.S.C. §§ 371 and 545, subject to forfeiture**
**pursuant to Title 18 U.S.C. §§ 982(a)(2)(B) and 545]**

1.     The allegations contained in Paragraph 1 through Paragraph 64 and Counts One through Six of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

a. Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), upon conviction of Smuggling of Equipment Used to Manufacture Controlled Substances into the United States in violation of Title 18, United States Code, Section 545, and upon conviction of a Conspiracy to Smuggle Equipment and Materials Used to Manufacture Controlled Substances into the United States, in violation of Title 18, United States Code, Sections 371 and 545, Defendants, **CAPSULCN INTERNATIONAL CO., LTD.**, also known as HUADACN Pharmaceutical Machinery Co., Ltd., Zhejiang Wisely Machinery Co. Ltd., iPharmachine Corp., Huada Pharmaceutical, Ruian Shanfan Enterprise Management Co. Ltd.,

Ruian Runfeng Enterprise Management Partnership, Ruian Danfeng Enterprise Management Partnership, Zhejiang CapsulCN Machinery Co., Ltd., Zhejiang CapsulCN Imp. & Exp Co., Ltd., and HUADACN Pharmaceutical Machinery Co., Ltd.; **XIAOCHUAN PAN**, also known as "潘肖川" and "Ricky Pan;" **TINGYAN YANG**, also known as "杨挺燕," "Monica Yang, and "Cici;" and **XI CHEN**, also known as also known as "晨曦" and "Inna;" shall forfeit to the United States of America any property, real or personal, which constitutes or is derived from proceeds traceable to said violations.

2.     If any of the property described above, as a result of any act or omission of the Defendants:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

## II.
## <u>Drug Violations and Forfeiture Statutes</u>
## [21 U.S.C. §§ 846, 843(a)(5) and (a)(7), subject to forfeiture
## pursuant to 21 U.S.C. §§ 853(a)(1) and (2)]

1.     The allegations contained in Paragraph 1 through Paragraph 64 and Counts Seven through Eighteen of this Indictment are hereby realleged and incorporated by reference for the

purpose of alleging forfeitures pursuant to Title 21, United States Code, Section 853.

2.      Pursuant to Title 21, United States Code, Section 853, upon conviction of an offense in violation of Title 21, United States Code, Sections  843(a)(5), 843(a)(6), 843(b), 846 and 848, Defendants **CAPSULCN INTERNATIONAL CO., LTD.**, also known as HUADACN Pharmaceutical Machinery Co., Ltd., Zhejiang Wisely Machinery Co. Ltd., iPharmachine Corp., Huada Pharmaceutical, Ruian Shanfan Enterprise Management Co. Ltd., Ruian Runfeng Enterprise Management Partnership, Ruian Danfeng Enterprise Management Partnership, Zhejiang CapsulCN Machinery Co., Ltd., Zhejiang CapsulCN Imp. & Exp Co., Ltd., and HUADACN Pharmaceutical Machinery Co., Ltd.; **XIAOCHUAN PAN**, also known as "潘肖川" and "Ricky Pan;" **TINGYAN YANG**, also known as "杨挺燕," "Monica Yang, and "Cici;" and **XI CHEN**, also known as also known as "晨曦" and "Inna;" shall forfeit to the United States of America any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such offenses and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, the offenses. This property includes, but is not limited to the following domain names:

a.      capsulcn.com;

b.      huadapharma.com;

c.      pillmold.com; and

d.      ipharmachine.com.

3.      If any of the property described above, as a result of any act or omission of Defendants:

a.      cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third party;

c.    has been placed beyond the jurisdiction of the court;

d.    has been substantially diminished in value; or

has been commingled with other property which cannot be divided without difficulty, the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

## III.
## Money Laundering Violation and Forfeiture Statutes
### [18 U.S.C. §§ 1956(a)(2)(A) and (h), subject to forfeiture pursuant to 18 U.S.C. § 982(a)(1)]

1.    The allegation contained in Paragraph 1 through Paragraph 64 and Counts Nineteen through Twenty-Two of this Indictment is hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 982(a)(1).

2.    Pursuant to Title 18, United States Code, Section 982(a)(1), upon conviction of an offense in violation of Title 18, United States Code, Section 1956, Defendants **CAPSULCN INTERNATIONAL CO., LTD.**, also known as HUADACN Pharmaceutical Machinery Co., Ltd., Zhejiang Wisely Machinery Co. Ltd., iPharmachine Corp., Huada Pharmaceutical, Ruian Shanfan Enterprise Management Co. Ltd., Ruian Runfeng Enterprise Management Partnership, Ruian Danfeng Enterprise Management Partnership, Zhejiang CapsulCN Machinery Co., Ltd., Zhejiang CapsulCN Imp. & Exp Co., Ltd., and HUADACN Pharmaceutical Machinery Co., Ltd.; **XIAOCHUAN PAN**, also known as "潘肖川" and "Ricky Pan;" **TINGYAN YANG**, also known as "杨挺燕," "Monica Yang, and "Cici;" and **XI CHEN**, also known as also known as "晨曦" and "Inna;" shall forfeit to the United States of America any property, real or personal, involved in such offense, and any property traceable to such property.

3.    If any of the property described above, as a result of any act or omission

43

of Defendant:

        a.      cannot be located upon the exercise of due diligence;

        b.      has been transferred or sold to, or deposited with, a third party;

        c.      has been placed beyond the jurisdiction of the court;

        d.      has been substantially diminished in value; or

has been commingled with other property which cannot be divided without difficulty, United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

A TRUE BILL.

FOREPERSON OF THE GRAND JURY

AMANDA LISKAMM
DIRECTOR
U.S. DEPARTMENT OF JUSTICE
CONSUMER PROTECTION BRANCH

By: _____

    COLIN W. TRUNDLE
    KAITLIN SAHNI
    EDWARD E. EMOKPAE
    CADESBY B. COOPER
    SCOTT B. DAHLQUIST
    Trial Attorneys

MARGARET F. LEACHMAN
ACTING UNITED STATES ATTORNEY

BY: _____

    DONNA MILLER
    LAURA GREGORY
    STEVEN SPITZER
    Assistant United States Attorneys